**2021 IL 126577**

# IN THE

# SUPREME COURT

# OF

# THE STATE OF ILLINOIS

_____

(Docket No. 126577)

JANE DOE, Appellant, v. BEAU PARRILLO, Appellee.

*Opinion filed November 18, 2021.*

JUSTICE THEIS delivered the judgment of the court, with opinion.

Justices Garman, Michael J. Burke, Overstreet, and Carter concurred in the judgment and opinion.

Chief Justice Anne M. Burke and Justice Neville took no part in the decision.

**OPINION**

¶ 1     The central issue in this case is whether the appellate court erred in reducing the punitive damages awarded by the jury to plaintiff Jane Doe against defendant Beau Parrillo. For the reasons that follow, we reverse the appellate court's judgment in part, affirm the appellate court's judgment in part, and affirm the trial court's

judgment on the jury's verdict.

¶ 2                                    BACKGROUND

¶ 3        This case began in 2016 when Doe filed her complaint and ended in 2019 when the trial court denied Parrillo's posttrial motion. The intervening 30 months involved delays and disputes that require an extended description.

¶ 4        On December 15, 2016, Doe filed a five-count complaint against Parrillo. Count I alleged that, on October 5, 2015, at 5:55 a.m. at Doe's residence in Chicago, Parrillo struck and choked her and "made physical contact of an insulting or provoking nature" with her in violation of section 12-3.2(a)(2) of the Criminal Code of 2012 (Criminal Code), which prohibits domestic battery against any family or household member. See 720 ILCS 5/12-3.2(a)(2) (West 2014). Count II alleged that, on November 5, 2015, at 11 p.m. at the Swissotel in downtown Chicago where Doe was a guest, Parrillo struck her and "made physical contact of an insulting or provoking nature" with her in violation of section 12-3.2(a)(2) of the Criminal Code. Count III alleged that, on November 9, 2015, at 11 p.m. at the Swissotel where Doe was a guest, Parrillo "grabbed [Doe] using his hands with force and violence and then shoved her against the wall" and "made physical contact of an insulting or provoking nature" with her in violation of section 12-3.2(a)(2) of the Criminal Code. Count IV alleged that, on December 12, 2015, at 6:30 a.m. at the Inn of Chicago in downtown Chicago where Doe was a guest, Parrillo "physically restrained [Doe] with force and violence against her will," struck her face and mouth with a closed fist, struck her in the head with a glass coffee maker, strangled her neck with his hands, and "made physical contact of an insulting or provoking nature" with her in violation of section 12-3.2(a)(2) of the Criminal Code. Count V alleged that, on March 23, 2016, at 11:30 a.m. at the Westin hotel in Lombard where Doe was a guest, Parrillo "physically restrained Plaintiff with force and violence against her will, strangled her neck with his hands, and "sexually assaulted and raped" her "by knowingly inflicting sexual intrusion and penetration of her vagina against her will and without her consent" in violation of section 11-1.20(a)(1) of the Criminal Code. See *id.* § 11-1.20(a)(1). The final count further alleged that Parrillo was at the hotel in violation of an order of protection.

¶ 5        After months of repeated, unsuccessful attempts by Cook County sheriff's deputies to serve Parrillo with the complaint, Doe obtained an order from the trial court appointing a special process server. Apparently, service was accomplished because, on April 6, 2017, the trial court entered an order giving Parrillo 28 days to answer or otherwise respond to the complaint. On May 4, 2017, attorney Allison Muth filed an appearance for Parrillo, as well as an answer to the complaint denying the substance of Doe's allegations.

¶ 6        On October 20, 2017, Doe's attorney attended a case management conference. Muth did not. The trial court granted Doe leave to amend her complaint to seek punitive damages. The court further found that Parrillo was in default and that "the complaint is confessed against" him. That day, Doe filed an amended complaint, which was similar to her initial complaint, except that each count sought "punitive damages in an amount sufficient to punish the conduct of the Defendant and deter others from committing similar torts."

¶ 7        A month later, Parrillo filed a motion for substitution of judge as of right, as well as a motion to vacate the default against Parrillo. In the motion to vacate, Muth stated that she was "in trial in the Fourth District of the Circuit Court of Cook County and was unexpectedly unable to attend the case management status call." On December 15, 2017, Parrillo withdrew the motion for substitution of judge and received leave to answer Doe's amended complaint by January 11, 2018. On January 10, Parrillo filed an answer to the amended complaint, again denying the substance of Doe's allegations. Parrillo also filed affirmative defenses, announcing that he "may rely" on the defenses of consent, self-defense, and provocation.

¶ 8        The parties engaged in discovery. On October 16, 2018, Doe filed a motion for sanctions, arguing that Parrillo had "continuously abused discovery rules" and "disobeyed this Court's orders" by failing to produce certain documents requested by Doe. According to Doe, Parrillo had "made it nearly impossible to prosecute this lawsuit." Doe requested a default judgment against Parrillo or, alternatively, a bar to his testimony at trial. Doe also requested monetary sanctions. On November 2, 2018, the trial court granted Doe's motion, finding that Parrillo had shown "a deliberate, continuous disregard" of discovery rules and court orders. The trial court barred his trial testimony.

¶ 9    On November 21, 2018, the trial court vacated that order and entered and continued Doe's motion for sanctions, granting Parrillo time to respond. He did so the following week, essentially insisting that he had answered or objected to all written discovery requests and intended to comply with all court-ordered requests. He conceded that

> "he is a man of financial means, but the Plaintiff has no right to assume liability based [on] Mr. Parrillo's financial status. Plaintiff would accomplish a great deal more by focusing on the elements of pleading a *prima facie* case, and the Plaintiff's financial ability to pay a judgement."

¶ 10    On December 7, 2018, the trial court ordered that discovery was closed. On January 7, 2019, more than two years after Doe filed her complaint, the court certified the case for trial on January 14, 2019. On January 14, Robert Holstein filed an appearance on behalf of Parrillo, and Muth filed an emergency motion for a continuance of the trial date. That motion mentioned Holstein's appearance and stated that he had been "briefed of the issues for trial and tendered the discovery" but would need additional time to prepare for Parrillo's defense. The motion continued, claiming:

> "*** Defendant, Beau Parrillo received news on the eve of trial that his father, Richard Parrillo Sr., was hospitalized in critical health in Florida. Mr. Parrillo had to fly to Florida this morning and will be inavailble [sic] this week for his trial.

> *** In addition, it has come to the attention of the Defense that two critical eyewitnesses are unavailable for the week of January 14th, 2019.

> *** [A]ttorney Muth's mother is in failing health, and has recently just come home from the hospital. Attorney Muth is her caregiver, and therefore Muth will not be able to adequately prepare for trial and take the time for a Jury trial this week, as it is expected this trial will take at least three full days."

Though Muth represented that she intended to be available for trial "in the next two weeks," she requested a 30- to 60-day continuance.

¶ 11    The emergency motion was supported by two affidavits: one from Parrillo and one from Muth. In his affidavit, Parrillo stated:

"*** [A]t approximately 10:30pm, on January 13, 2019, I received a call that my father, Richard Parrillo Sr., had been hospitalized at Aventura Hospital and Medical Center in Aventura, Florida.

*** Due to the nature of his diagnosis, it was imperative that I went on the next flight out of Chicago to Aventura, Florida as soon as possible to be with my father.

*** I took the first flight I could get to Fort Lauderdale at 8:20am on January 14, 2019.

*** I informed my counsel, Allison Muth, on the morning of January 14, 2019, as to my need to leave the state and be with my father, and asked her to ask the Court for a continuance of this trial, so that I could focus on my father's health.

*** I am currently still in Aventura, Florida, and as of now, I am not sure if my father's health will improve, and that he will be stable enough for me to leave him to attend trial.

*** I intend on returning to Chicago as soon as possible, and will be present for my trial if the date of trial could be changed to a later date."

¶ 12    In her affidavit, Muth stated:

"*** [O]n the morning of January, 14, 2019,1 received a call from my client, Mr. Beau Parrillo, that his father, Mr. Richard Parrillo Sr., had been hospitalized in critical health at Adventure Hospital in Miami, Florida.

*** Due to the nature of the situation. Beau Parrillo needed to fly on an 8:20am flight from Chicago to Miami to be with his father and is unable to attend his trial today.

*** I intend on using Beau Parrillo as a key witness in this trial.

*** [M]y own mother, is suffering from medical issues and has just gotten out of the hospital and needs care and cannot be left alone for long periods of time, as she is still weak. I am her caregiver, along with my brother. Therefore, having a jury trial this week would place a burden on my family. I expect my

mother's health to improve in the next few weeks so I can return to practicing law full time.

*** I believe it will be in the best interest of both my client and myself to continue this trial to a later date when these unforeseen circumstances are no longer an issue that will hinder trial."

¶ 13    On the evening of January 14, Doe filed a motion for default judgment against Parrillo for disregarding her Illinois Supreme Court Rule 237(b) (eff. July 1, 2005) notice to appear at trial. The next document in the common-law record is a January 15, 2019, order by the trial court entering judgment on the jury's $9 million verdict in favor of Doe. The record then contains jury instructions—both those given and those rejected by the trial court—and a completed verdict form. The jury awarded Doe $200,000 for "Loss of Normal Life," $200,000 for "Pain and Suffering," $200,000 for "Emotional Distress," $200,000 for "Future Loss of Normal Life," and $200,000 for "Future Pain and Suffering," totaling $1 million in compensatory damages. The jury also awarded her $8 million in punitive damages. The record contains no transcript of any trial proceedings.

¶ 14    The day of the jury's verdict, Muth filed a motion for mistrial. The trial court scheduled a status hearing for February 8, 2019. Two attorneys—Anthony Pinelli and Ronald Neville—then filed additional appearances on behalf of Parrillo. On February 7, Neville and Pinelli, "along with" Muth, filed a "MOTION FOR AN EXTENSION OF TIME TO PRESENT THE COURT WITH A PROPOSED ORDER OUTLINING THE CHRONOLOGY OF PROCEDURAL AND FACTUAL EVENTS WHICH OCCURRED ON JANUARY 14 AND 15, 2019 PRIOR TO THE JURY TRIAL AND TO FILE POST-TRIAL MOTIONS." The trial court allowed that motion but denied Muth's still-pending motion for a mistrial. In the order denying the latter motion, the trial court stated:

"Defendant had two opportunities to file an emergency motion to continue trial with supporting affidavits: on the day the case was set for trial in Courtroom 2005 and the following day after the case was assigned for jury trial before Judge Varga. Judge Varga advised plaintiff's and defendant's attorneys that he would begin jury selection the day after the case was assigned to him and take a break during jury selection for defendant's attorneys to appear before

- 6 -

the Presiding Judge in Courtroom 2005 for presentation of an emergency motion to continue trial.

Not only did defendant's attorneys fail to present an emergency motion to continue trial, one failed to appear for jury selection and one appeared but chose not to participate in jury selection. Neither attorney participated during the jury trial. Defendant's attorneys appeared for the return of the verdict and presentation of the motion for mistrial."

¶ 15 Doe's attorney filed a citation to discover Parrillo's assets. On February 19, 2019, Parrillo's attorneys filed a motion to "quash and strike" such supplemental proceedings. They also filed a "MOTION FOR A COPY OF THE JUDGE'S TRIAL NOTES AND COPIES OF THE JURY CARDS OF THE JURORS IN THIS CASE." That motion stated:

"Parrillo's attorneys are in the process of preparing post-trial motions in this case. Because no court reporter or other person, to Parrillo's knowledge, transcribed or recorded the testimony and arguments presented to the jury or identified the exhibits which were admitted into evidence and presented to the jury, Parrillo's attorneys are attempting to reconstruct the testimony and exhibits. One method of doing so would be to obtain a copy of the trial court's trial notes which might contain a summary of the testimony and a list of the admitted exhibits. A second method would be to interview jurors who would consent to an interview and obtain information about the testimony, exhibits and arguments by plaintiff's attorneys during the trial."

According to Parrillo's attorneys, he would be "prejudiced if he cannot obtain an accurate summary of the trial testimony and learn which exhibits were presented to and reviewed by the jury."

¶ 16 On February 25, 2019, Parrillo's attorneys filed a "MOTION REQUESTING THE COURT TO ENTER AN ORDER REQUIRING THE PLAINTIFF'S ATTORNEYS TO IDENTIFY THE EXHIBITS RECEIVED INTO EVIDENCE AT THE JURY TRIAL IN THIS CASE AND TO PROVIDE COPIES OF SAID EXHIBITS TO THE DEFENDANT'S ATTORNEYS." The motion asserted that, several weeks earlier, Muth asked Doe's attorney to provide copies of the exhibits introduced during the trial. Doe's attorney reportedly directed Muth to "the court

file," but the exhibits could not be located there. Neville asked Doe's attorney to identify and provide copies of the exhibits, but to no avail. On February 27, 2019, the trial court denied Parrillo's motion for the judge's trial notes and the jury cards. The court's order noted that Doe's attorney would provide a list and copies of the exhibits.

¶ 17     On March 13, 2019, Parrillo's attorneys filed a posttrial motion asking the court to vacate its judgment on the jury's verdict and to order a new trial. That motion and Muth's attached affidavit attempted to fill some blanks in the incomplete record. The motion repeated that Muth's mother was seriously ill on the eve of trial and that Parrillo's father was admitted to a Florida hospital in critical condition on the same day. In a footnote, Parrillo's attorneys acknowledged that "not all the statements made in Beau Parrillo's January 14, 2019 [affidavit] were true, *e.g.*, he was not in Florida on January 14, 2019, but the fact his father was in critical condition and Beau Parrillo's mental state was so affected thereby that he could not testify cannot be reasonably contested."

¶ 18     According to Parrillo's attorneys, Muth electronically filed an emergency motion for a continuance on the evening of January 13, 2019. On January 14, she arrived at the courthouse before the presiding judge's emergency motion call and learned that the case had already been assigned to Judge Varga for trial. Holstein was at the assignment proceeding but did not participate because he was unsure whether his appearance had been filed by Muth. The presiding judge's clerk advised Muth to present her emergency motion to Judge Varga. Muth did so, and Judge Varga declined to hear the motion, stating that he lacked the authority to allow such a motion pursuant to local rule. Judge Varga left the courtroom to speak to the presiding judge about the case but could not locate him. When Judge Varga returned to the courtroom, he advised Muth that the emergency motion was not in the court file.

¶ 19     Muth and Holstein left the courtroom and went to the circuit court clerk's office, where they discovered that the emergency motion for a continuance and Holstein's appearance, both of which Muth attempted to e-file the night before, had been rejected because a "confidential box" on the form was "inadvertently checked." Muth then refiled Holstein's appearance and the emergency motion, which was

then supported by her affidavit.[1] The motion would be heard the next day during the presiding judge's 11 a.m. emergency motion call. Muth returned to the courtroom and told Judge Varga of the current status of the motion and asked him to grant a continuance. He refused. Doe's attorney then made an oral motion for a default judgment because Parrillo had failed to comply with her Rule 237 notice to appear. Judge Varga denied that motion without prejudice. He recessed for the day, alerting the parties that jury selection would begin at 9:30 a.m. the next morning.

¶ 20       In her nine-page affidavit, Muth asserted that her mother's health deteriorated that morning. Muth called Holstein to instruct him to inform Judge Varga that she would not be there at 9:30 a.m.; Holstein did not answer his phone. Shortly thereafter, Muth received a voicemail from Doe's attorney, stating that jury selection was beginning. Muth called Doe's attorney, but she did not answer her phone. According to Muth, Holstein arrived at the courtroom as the venire assembled in the hallway. Before beginning jury selection, Judge Varga asked Holstein if he intended to participate in the trial. Holstein answered that he was uncertain whether his appearance had been filed and that he felt his participation would jeopardize the pending emergency motion. Judge Varga also asked Holstein whether Muth was on her way. Holstein answered that Muth was caring for her mother but intended to present the emergency motion for a continuance to the presiding judge at 11 a.m.

¶ 21       Muth arrived at the courthouse around 11:30 a.m. and missed the presiding judge's emergency motion call. Despite her entreaties to the presiding judge's court clerk and the chief judge's court clerk, the emergency motion would not be heard until January 16. When Muth eventually reached the courtroom, she saw that the trial was underway. She left to prepare a motion for a mistrial. She returned to present the motion and observed Judge Varga discussing jury instructions with Doe's attorney. According to Parrillo's attorneys, Muth mentioned the motion, and Judge Varga directed her "to sit down and wait until the jury instruction conference was finished." Muth and Holstein requested to see the proposed instructions and to participate in the conference, but Judge Varga denied them an opportunity to do so. Parrillo's attorneys insisted that he and Muth "were not present during the trial because the trial court elected to proceed to trial in their absence." And they

---

[1]Parrillo's affidavit was filed later that evening.

maintained, "Having the benefit of no defense or cross-examination to deal with, the plaintiff and her attorneys moved forward with all dispatch and without a court reporter despite having told Muth days earlier they had hired a court reporter for the trial."

¶ 22 The posttrial motion raised five points. First, Parrillo argued that the trial court abused its discretion and "failed to protect the rights of the defendant and the integrity of the judicial process" by refusing to grant his emergency motion for a continuance. Second, Parrillo argued that the trial court violated "the statutory purpose and objective" of section 2-1107 of the Code of Civil Procedure concerning jury instruction conferences and "extremely exacerbated" that error in failing "to insist on the presence of a court reporter." Parrillo further asserted that the issues instruction was improper. Third, Parrillo argued that the compensatory damages awarded by the jury lacked evidentiary support. Fourth, Parrillo argued that the punitive damages awarded by the jury were excessive and violative of due process. Fifth, Parrillo argued that Doe's medical records were inadmissible without a foundation.

¶ 23 The trial exhibits were appended to the posttrial motion. The first 20 exhibits are photos, 11 of which showed Doe with various injuries, including a black eye and wounds on her forehead, ear, neck, arm, and finger. Next, there are three pages of what appear to be transcribed text messages between Parrillo and Doe on October 24, 2015, from 10:27 p.m. to 11:23 p.m. In those messages, Parrillo said:

> "You won't return my calls and keep hanging up on me your [*sic*] fucked.
>
> You r [*sic*] such a piece of shit call me now
>
> Or I swear
>
> Were [*sic*] done
>
> So hard watch
>
> I will ruin u
>
> &ast; &ast; &ast;
>
> Its [*sic*] about to get worse

- 10 -

10 times worse

* * *

Look over your shoulder

Its [*sic*] about to get fun

Hahhahahhahj

Ready

Fun or flee

You should flee."

¶ 24    Next, there are three cellphone screenshots of what appear to be text messages between Parrillo and an unknown person on an unknown date. Parrillo said:

"I choked [Doe] get me out of hyatt

Nowbe [*sic*] at Swiss otel running there now

* * *

Hurry I'm inbar

Hurry bitch

Now she's got injunction against me security called room went downstairs hurry now fucker

At Swiss otel Wabash now."

¶ 25    Finally, there is a December 12, 2015, radiologist's report that states Doe had facial trauma and jaw malocclusion but no facial fracture, discharge instructions from Northwestern Memorial Hospital on that same date, listing Doe's diagnosis as "Facial trauma; Victim of domestic violence," and a Cook County State's Attorney "Notice of Victim's Rights" form signed by Doe on December 14, 2015.

- 11 -

¶ 26    On March 13, 2019, Neville also filed a motion to substitute Parrillo's earlier affidavit that contained admitted falsehoods with a new affidavit. In the new affidavit, Parrillo asserted:

"*** On January 13, 2019, my father, Richard Parrillo, was admitted into the Adventura Hospital in Florida in critical condition. I have a close personal relationship with my father and when I learned of his medical condition on January 13, 2019, I became emotionally distressed, despondent, extremely anxious, and afraid that I was about to lose my father.

*** I spoke to my attorney, Allison Muth, and advised her about my father and that I was in no mental condition to proceed to trial and testify. I told her that I intended to travel to Florida on January 14, 2019 to be with my father. Attached are copies of airline reservations for passage to Florida on January 14, 2019 with a return trip on January 19, 2019.

*** In fact I never traveled to Florida on January 14, 2019 because I learned from my father's contacts that the doctors at Adventura Hospital were considering placing my father on an air ambulance to be transported to the University of Chicago Hospital which actually occurred on January 16, 2019. I did not want to go to Florida only to learn that my father had left that State and returned to Chicago.

*** My distress level was so high that I began to made [sic] poor judgment decisions including telling my attorney when I spoke to her [on] January 14,2019 that I did fly to Florida and was still in Florida when I spoke to her. These untrue statements to her caused her to prepare an affidavit including these untruthful statements to be attached to an emergency motion for an [*sic*] continuance of the trial which was scheduled on January 14, 2019.

*** At the time, I was not aware my location to be the basis for a continuance of the trial but instead believed the basis was my father's medical condition, my desire to be with him, and, due to my mental state, my inability to testify.

*** When my affidavit dated January 14, 2019 was forwarded to me for signature by my attorney I, without reading the document, contacted my

assistant *** and authorized him to computer DocuSign my signature to the affidavit and send the signed affidavit to my attorney, Allison Muth. Again, I did not believe my location was the basis for the continuance but instead the basis was my father's medical condition, my desire to be with him, and, due to my mental state, my inability to testify. I should have changed my location in the written affidavit but I was not thinking clearly.

If I were to testify at trial, I would address the testimony of the plaintiff that I assaulted, battered, and sexually assaulted her on five separate occasions as alleged in the plaintiff's amended complaint. I would specifically testify that I never, at any time or at any place, assaulted, battered, or sexually assaulted the plaintiff. I gave a deposition in this case and specifically testified that I never, at any time, or at any place, including the five dates referenced in the plaintiff's amended complaint assaulted, battered, or sexually assaulted the plaintiff. In addition, I would testify to specific facts that would establish the affirmative defenses of consent, provocation, self-defense, defense of property, and the plaintiff's contributory negligence."

¶ 27    On June 5, 2019, the trial court held a hearing on Parrillo's posttrial motion. The hearing was lengthy and contentious. Judge Varga began with a series of questions, including whether Parrillo's first affidavit contained a lie. Neville disagreed, insisting that it contained merely "an inaccuracy." Judge Varga stated that, on January 15, 2019, he saw Muth and Holstein standing in the hallway outside the courtroom and asserted that they and Parrillo "abandoned the case for jury selection" and "abandoned the trial of the case." Judge Varga continued:

"[S]o [Muth] doesn't get a continuance, and so they get together, the three of them, Ms. Muth and Mr. [Holstein] and Mr. Parrillo. And so they make a conscious decision, okay? We were unsuccessful in continuing the case. Now what do we do?

You know what they decided?

* * *

Well, the conscious decision was, we're walking away from the trial. That's what happened."

- 13 -

¶ 28 At the end of the hearing, Judge Varga denied the posttrial motion, and Neville confirmed that the order should read that the motion was denied for the reasons stated on the record. Such an order, however, does not appear in the record. Instead, there is a six-page order drafted by Judge Varga. Judge Varga characterized the defense's conduct as "the most audacious attempt to undermine the judicial process which this Court has seen in over twenty-four years." Judge Varga revisited his conclusion that Muth and Holstein abandoned the case:

> "Did Ms. Muth or Mr. Holstein seek to participate during the trial, despite standing in the hallway and looking through the glass doors? Participation during trial means opening statements, examination of witnesses, and closing arguments. The only act Ms. Muth or Mr. Holstein did through the trial was file and argue a motion for mistrial after the jury entered the jury room to begin deliberations. The Court denied the motion. *** Did Ms. Muth and Mr. Holstein make a conscious decision not to participate during trial? Did they abandon the trial? The Court pressed them: after the Emergency Motion to Continue Trial was not presented and the case remained for trial in [Judge Varga's courtroom], what were they going to do? The Court concludes that they walked away from the trial and abandon[ed] it."

Judge Varga then summarized his impressions:

> "[T]he defendant lied in an affidavit to seek a trial continuance, the defense attorneys failed to follow a well-known and well-understood circuit court rule ***, and the defense attorneys and defendant abandoned the trial. In conclusion the title of defendant's attempt should read, 'A Conspiracy to Undermine the Integrity of the Judicial Process—or— How Not to Get a Trial Continuance in the Law Division.' First, lie; second, don't follow rules; and third, if the first and second don't work, don't show up for trial."

¶ 29 Judge Varga also addressed several specific arguments raised in Parrillo's posttrial motion. According to Judge Varga, the defense waived any purported evidentiary or instructional errors. He added that the compensatory damages awarded by the jury were not unreasonable in light of Doe's testimony and that the punitive damages awarded by the jury were appropriate as a reflection of "the reprehensibility of the defendant's misconduct and the harm suffered by the plaintiff." Finally, Judge Varga noted that, "[d]espite defense counsel's

unsupported argument, judges don't order court reporters; the parties order court reporters and pay them." Parrillo appealed.

¶ 30     The appellate court affirmed the trial court's decision in every respect, except as to punitive damages. 2020 IL App (1st) 191286. The appellate court initially rejected Parrillo's argument that comments by Judge Varga at the hearing on the posttrial motion demonstrated bias. *Id.* ¶ 37. According to the appellate court, the judge's comments stemmed from frustration with defense counsel's conduct, not deep-seated antagonism toward Parrillo. *Id.*

¶ 31     The appellate court then discussed the emergency motion for a continuance, reviewing the events of January 13-15, 2019. Though trial judges have discretion to enter appropriate orders, including short continuances, "a reasonable person could take the same view as Judge Varga and proceed with trial." *Id.* ¶ 43. The judge had given Muth two opportunities to present her motion to the presiding judge, but she "repeatedly stumbled." *Id.* ¶ 41. Judge Varga did not abuse his discretion in declining to offer Muth a third opportunity. *Id.* ¶ 44.

¶ 32     The appellate court further held that Judge Varga's decision to proceed with the trial in Parrillo's absence did not violate due process. He and his attorneys had notice of the trial, but Muth and Holstein abdicated their ethical obligations to their client. *Id.* ¶¶ 49-50. Instead of cross-examining Doe, presenting evidence, and participating in the jury instruction conference, Muth and Holstein opted to stand in the hallway and "pin their client's case on a motion for a mistrial." *Id.* ¶ 49. According to the appellate court, the failure to offer a defense fell squarely on Parrillo and his attorneys, not on Judge Varga. *Id.* ¶ 50. The court reasoned:

> "Counsel refused to participate in jury selection or trial or take steps to properly present the motion for a continuance to the presiding judge. Parrillo filed an untruthful affidavit. Together, this appears more like a tactic to secure a continuance than a series of unfortunate events. We do not know when Parrillo learned of his counsel's refusal to participate in the trial, to walk away and take their chances. Either Parrillo chose to rely on (and perhaps participate) in his attorneys' decision or laid low to conceal his falsehoods." *Id.* ¶ 51.

Further, as appellant, Parrillo bore the burden to provide a sufficiently complete record to support any claims of error, as well as the consequences for any deficiencies in the record due to the lack of a court reporter. *Id.* ¶ 59.

¶ 33    The appellate court next rejected Parrillo's contention that the trial court erred in refusing to allow his attorneys to participate in the jury instruction conference and in issuing improper instructions. Without a transcript, the appellate court presumed that the trial court's decision was proper and not an abuse of discretion. *Id.* ¶ 63. Additionally, any claims of error as to the instructions given to the jury were waived when Parrillo's attorneys did not object to them. *Id.* ¶ 62. The appellate court then rejected Parrillo's contention that the amount of compensatory damages was excessive. Again, the lack of a transcript prevented the appellate court from assessing Doe's testimony that could have supported the jury's damage award. *Id.* ¶ 71. "Based on the evidence in the record, we cannot say the amount awarded exceeded the range of fair and reasonable compensation or was so large as to shock the judicial conscience." *Id.*

¶ 34    Finally, the appellate court addressed Parrillo's argument that the jury's $8 million punitive damages award violated due process. The appellate court reviewed *BMW of North America, Inc. v. Gore*, 517 U.S. 559 (1996), where the United States Supreme Court identified three guideposts to determine whether punitive damages pass constitutional muster. 2020 IL App (1st) 191286, ¶ 77. The appellate court found Parrillo's arguments on each guidepost uncompelling. *Id.* ¶¶ 79-83. The court, however, noted that *Blount v. Stroud*, 395 Ill. App. 3d 8, 26 (2009), stated that punitive damages four times the amount of compensatory damages falls close to that line of constitutional impropriety. 2020 IL App (1st) 191286, ¶ 84. The court concluded that punitive damages eight times the amount of compensatory damages crosses that line. *Id.* Accordingly, the court reduced Doe's punitive damages to $1 million. *Id.*

¶ 35    This court allowed Doe's petition for leave to appeal. See Ill. S. Ct. R. 315(a) (eff. Oct. 1, 2020). Parrillo requested cross-relief.

¶ 37                                   1. Doe's Appeal

¶ 38        Doe argues that the appellate court erred in reducing the amount of punitive damages awarded by the jury. Typically, a reviewing court will address a defendant's challenge to the jury's punitive damages award under either the common law or the United States Constitution. See *Blount*, 395 Ill. App. 3d at 22 ("The Illinois common law punitive damages inquiry is distinct from the constitutional challenge."). Here, the appellate court did just that. The court rejected Parrillo's state common-law claim. See 2020 IL App (1st) 191286, ¶ 75 ("The jury's finding that punitive damages were warranted based on the evidence it heard was not against the manifest weight of the evidence."); see *Blount*, 395 Ill. App. 3d at 22; *Franz v. Calaco Development Corp.*, 352 Ill. App. 3d 1129, 1145 (2004) ("A judge or jury's assessment of punitive damages will not be reversed unless the manifest weight of the evidence shows that the assessment was so excessive as to demonstrate passion, partiality, or corruption on the part of the decision-maker.").[2] The court further rejected his federal constitutional claim, stating that he failed to offer "a compelling argument for reducing the amount of punitive damages." 2020 IL App (1st) 191286, ¶ 84. The appellate court then, *sua sponte*, considered whether a lesser amount of punitive damages "would achieve the goals of punishment and deterrence, without stepping over the line of constitutional impropriety" and concluded that "a punitive damages award of $1 million satisfies due process while also sending a strong message to Parrillo and others that this conduct is reprehensible and condemned in the strongest terms." *Id.* It is the appellate court's ultimate conclusion that is the subject of Doe's appeal.

¶ 39        Doe makes five points. First, she contends that the appellate court ignored long-standing precedent from this court regarding punitive damages. Second, she contends that the appellate court improperly relied upon *Blount*, which, because it also ignored long-standing precedent from this court, must be reversed. Third, she

---

[2]Indeed, the appellate court could not have held otherwise. With just the handful of trial exhibits appended to Parrillo's posttrial motion, the appellate court knew only what the jury saw, not what it heard from Doe herself and how that may have affected its decision. In short, it would have been impossible for the appellate court to conclude that the jury's finding that Parrillo acted willfully or maliciously was against the manifest weight of the evidence without the ability to consider most of that evidence, *i.e.*, without a trial transcript.

contends in the alternative that the appellate court improperly applied *Blount*. Fourth, she contends that the appellate court ignored controlling precedent from the United States Supreme Court. And fifth, she contends that the appellate court's decision was arbitrary and capricious.

¶ 40    Parrillo's argument regarding punitive damages is almost incomprehensible, amounting to little more than untethered quotes and a preview of his cross-appeal. In the section of his response brief ostensibly meant to address whether the jury's punitive damages award violated due process, Parrillo expresses other concerns: "The bottom line in this case is that defendant was denied due process when the trial court allowed a jury trial to inappropriately proceed in his and his defense counsel's absence." According to Parrillo, that due process violation resulted in a due process violation in the form of an "unconstitutionally excessive punitive damages award." At the core of both parties' arguments rests the constitutional standard, which has been discussed repeatedly by the Supreme Court. We begin with those cases.

¶ 41    The United States Supreme Court's attempts to fashion a current standard for determining the constitutionality of punitive damages began with *Pacific Mutual Life Insurance Co. v. Haslip*, 499 U.S. 1 (1991). There, the Court noted that punitive damages are a long-standing, traditional part of state tort law (*id.* at 15) and that the common-law method for assessing such damages does not violate due process (*id.* at 17-18). The question that warranted the Court's attention, however, was not one of method or procedure but one of substance—namely, could the magnitude of a punitive damages award itself violate due process? The answer was clearly yes.

¶ 42    The Court stated that "unlimited jury discretion *** in the fixing of punitive damages may invite extreme results that jar one's constitutional sensibilities." *Id.* at 18. The Court declined to "draw a mathematical bright line between the constitutionally acceptable and the constitutionally unacceptable that would fit every case." *Id.* The Court was satisfied with merely commenting that "general concerns of reasonableness and adequate guidance from the court when the case is tried to a jury properly enter into the constitutional calculus." *Id.* The Court favorably mentioned state court review rules applicable in that case, which ensured that the punitive damage award was not "grossly out of proportion to the severity of the offense" and bore "some understandable relationship to compensatory

- 18 -

damages." *Id.* at 22. Though the punitive damages in *Haslip* were four times the amount of compensatory damages and that "monetary comparison[ ]" was "close to the line," the punitive damages did not lack "objective criteria" and did not violate due process. *Id.* at 23-24.

¶ 43    Five years later, the Court offered more guidance in *Gore*. The Court reiterated that the due process clause of the fourteenth amendment (U.S. Const., amend. XIV) prohibits a state from imposing a grossly excessive punishment on a tortfeasor. *Gore*, 517 U.S. at 562 (citing *TXO Production Corp. v. Alliance Resources Corp.*, 509 U.S. 443, 454 (1993)). The Court felt that "the federal excessiveness inquiry" as to punitive damages turned on the state interests that such damages serve— namely, punishment and deterrence. *Id.* at 568. Accordingly, the Court offered three "guideposts" for that inquiry: (1) "the degree of reprehensibility" of the defendant's conduct, (2) "the disparity between the harm or potential harm" suffered by the plaintiff and the amount of punitive damages, and (3) "the differences between this remedy [of punitive damages] and the civil penalties authorized or imposed in comparable cases." *Id.* at 574-75.

¶ 44    The Court clarified that the first guidepost, reprehensibility, was the most important because it related to " 'the enormity' " of the defendant's offense. *Id.* at 575 (quoting *Day v. Woodworth*, 54 U.S. 363, 371 (1851)). That is, "some wrongs are more blameworthy than others," particularly " 'crimes marked by violence or the threat of violence.' " *Id.* at 575-76 (quoting *Solem v. Helm*, 463 U.S. 277, 292-93 (1983)). The Court stated that the second guidepost, which it shorthanded as "ratio," was the most commonly cited due to its long pedigree in legal scholarship. *Id.* at 580. According to the Court, a comparison between compensatory and punitive damages is "significant" (*id.* at 581), but the constitutional line mentioned in *Haslip* is not "marked by a simple mathematical formula" (*id.* at 582). As it had in *Haslip*, the Court again rejected "a categorial approach" (*id.*), observing only that a ratio as high as 500 to 1 would surely " 'raise a suspicious judicial eyebrow' " (*id.* at 583 (quoting *TXO Production*, 509 U.S. at 481 (O'Connor, J., dissenting, joined by White, J.))). The Court stated that the third guidepost, comparable misconduct, encompassed both civil and criminal penalties sanctioned by the legislature. *Id.*

¶ 45     After acknowledging that the constitutional line is "inherently imprecise" (*United States v. Bajakajian*, 524 U.S. 321, 336 (1998)), the Court revisited and, to an extent, refined that line in *State Farm Mutual Automobile Insurance Co. v. Campbell*, 538 U.S. 408 (2003). There, the Court returned to the three *Gore* guideposts. Regarding reprehensibility, it instructed reviewing courts to consider several factors, including whether

> "the harm caused was physical as opposed to economic; the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; and the harm was the result of intentional malice, trickery, or deceit, or mere accident." *Id.* at 419.

The existence of only one factor may not be sufficient to sustain a punitive damage award; the absence of all of them "renders any award suspect." *Id.*

¶ 46     Regarding ratio, the Court again declined to impose a bright-line number but observed that, "in practice, few awards exceeding a single-digit ratio between punitive and compensatory damages *** will satisfy due process." *Id.* at 425. The Court referred to a long legislative history of double, treble, and quadruple damages, calling such ratios "instructive," in that "[t]hey demonstrate what should be obvious: Single-digit multipliers are more likely to comport with due process, while still achieving the State's goals of deterrence and retribution." *Id.* Greater ratios may still pass constitutional muster where there is a particularly egregious act marked by physical assault or physical injury. *Id.* at 425-26. In other words, the precise award must be "based upon the facts and circumstances of the defendant's conduct and the harm to the plaintiff." *Id.* at 425.

¶ 47     Regarding comparable misconduct, the Court repeated that reviewing courts should look to not only civil penalties but also criminal ones, which are indicative of "the seriousness with which a State views the wrongful action." *Id.* at 428. The Court cautioned, however, that

> "[w]hen used to determine the dollar amount of the award, however, the criminal penalty has less utility. Great care must be taken to avoid use of the civil process to assess criminal penalties that can be imposed only after the heightened protections of a criminal trial have been observed, including, of

course, its higher standards of proof. Punitive damages are not a substitute for the criminal process, and the remote possibility of a criminal sanction does not automatically sustain a punitive damages award." *Id.*

¶ 48 This court first adopted the *Gore* guideposts, as well as the gloss placed upon them by *Campbell*, in *International Union of Operating Engineers, Local 150 v. Lowe Excavating Co.*, 225 Ill. 2d 456 (2006). In *Lowe Excavating*, an excavation subcontractor filed a tortious interference complaint against a union. The subcontractor alleged that the union improperly picketed a federally funded project based on false information that the subcontractor was not paying prevailing wages to its employees. The trial court ultimately awarded the subcontractor $4680 in compensatory damages and $525,000 in punitive damages. The appellate court held that amount of punitive damages to be unconstitutionally excessive and reduced the amount to $350,000, a ratio of 75 to 1. Both parties appealed.

¶ 49 This court reversed and modified the punitive damages award to $50,000, "a double-digit ratio of approximately 11 to 1." *Id.* at 490. We explained that the union's conduct was "minimally reprehensible" and the appellate court's award of punitive damages far exceeded awards given in other cases where the defendant's conduct was much more egregious. *Id.* We distinguished two federal cases relied upon by the appellate court where the plaintiffs were victims of "extreme acts of sexual harassment" at work. *Id.* at 486. We accepted the reasoning of those cases that "a greater ratio is appropriate in cases where the injury suffered is primarily personal." (Internal quotation marks omitted.) *Id.* By contrast, the subcontractor did not suffer a physical or emotional injury, nor a personal one, because it was a corporation. *Id.* at 487. The subcontractor's injury could not be compared to "the humiliation suffered by individuals who endure sexual harassment in the workplace," and the union's conduct was "much less egregious" than that. *Id.*

¶ 50 The facts of this case are vastly different than those in that case, so our application of the *Gore*/*Campbell* guideposts will be, too. That analysis proceeds *de novo*. See *Cooper Industries, Inc. v. Leatherman Tool Group, Inc.*, 532 U.S. 424, 443 (2001).

¶ 51                                          *Reprehensibility*

¶ 52          Parrillo asserts that reprehensibility is "impossible" to consider given the absence of a trial record. We disagree. As evidenced by the photographs introduced as trial exhibits, her injuries were undoubtedly physical. Further, Parrillo's conduct showed not simply an indifference or reckless disregard for Doe's health, but actual intent to harm her on five occasions. On one of those occasions, December 12, 2015, Parrillo apparently told Doe that he would "ruin" her and that "things" would "get worse" for her while they would "get fun" for him. Then he advised her to "look over her shoulder" and "flee." Judge Varga, while acknowledging that he was not the trier of fact, stated that he listened to Doe's testimony that she was "the victim of sexual assault—in the old days, it was more descriptive, it was rape," as well as the victim of physical and psychological assault. He described the evidence: "The facts were, they were intentional acts. It was a physical act. You know, scars. I remember that. *** I mean, it was mental, it was sexual abuse, which was physical." When Neville mentioned reprehensibility and maintained that the jury could not make that determination because Parrillo did not testify and "they didn't hear both sides," Judge Varga responded quickly: "Reprehensible conduct? She said he sexually assaulted her. Ain't that reprehensible?"

¶ 53          We have no hesitation in concluding that Parrillo's conduct was egregiously reprehensible. Returning to what the Supreme Court observed in *Gore*, reprehensibility concerns the enormity of the defendant's conduct, and some torts are more enormous (or blameworthy) than others—namely, those that involve violence or a threat of it. See *Gore*, 517 U.S. at 575-76; see also *Florez v. Delbovo*, 939 F. Supp. 1341, 1347-48 (N.D. Ill. 1996) (stating that *Gore* intimated that a "hierarchy" of reprehensibility exists "with acts of violence or threats of bodily harm being the most reprehensible"); *Slovinski v. Elliot*, 237 Ill. 2d 51, 64 (2010) (stating that reckless conduct is "on the low end of the scale for punitive damages" compared to conduct involving a "deliberate attempt to harm another person"); *Blount*, 395 Ill. App. 3d at 25 (holding that threats of physical or mortal harm are "more reprehensible than nonviolent conduct"). Parrillo's conduct involved both, and the violence was recurring.

¶ 54                                      *Ratio*

¶ 55        The ratio of punitive to compensatory damages awarded by the jury here was 8 to 1. While that is higher than the 4 to 1 ratio described in *Haslip* as close to the line of constitutional impropriety, it is still a single-digit multiplier. We do not suggest that all single-digit multipliers comport with due process, but they are more likely to do so when the defendant's conduct is particularly egregious and the plaintiff's harm arose from a physical assault or injury. See *Campbell*, 538 U.S. at 425-26. Where, as here, that is true, a greater ratio is appropriate. *Lowe Excavating*, 225 Ill. 2d at 486-87.[3]

¶ 56                        *Sanctions for Comparable Misconduct*

¶ 57        Parrillo's conduct, as alleged in Doe's complaint, could have exposed him to criminal liability.[4] We recognize that punitive damages are no substitute for criminal punishment and that "the remote possibility of a criminal sanction does not automatically sustain a punitive damages award." *Campbell*, 538 U.S. at 428. Such a sanction, however, does show that the State takes domestic violence and sexual assault seriously.

¶ 58        We conclude that the jury's punitive damages award was not unconstitutionally excessive under *Gore* and *Campbell*. There is no trial transcript, so we do not know what Doe told the jury. We do know what she alleged, and we know how she looked after one of Parrillo's attacks. And we do know that the trial court provided

_____

[3]Doe insists that the appellate court ignored *Campbell*'s instruction that single-digit multipliers are never constitutionally excessive. In Doe's view, the Court approved punitive damages "up to nine *** times" the amount of compensatory damages. Doe misreads *Campbell*. She pares down the Court's punitive damages jurisprudence to a simple, numerical proposition—anything under a 10 to 1 ratio is always constitutional—under which the jury's punitive damages award here passes muster. The analysis is more nuanced and fact-intensive. See *Bajakajian*, 524 U.S. at 336.

Additionally, contrary to Doe's argument, *Blount* did not establish a "bright-line test" under which a 4 to 1 ratio is the limit of constitutional propriety. Rather, *Blount* recounted the Court's statement in *Campbell* that *Gore* and *Haslip* referred to such a ratio and that the latter case surmised that that ratio may be close to the due process line.

[4]There is no indication in the record whether Parrillo was ever prosecuted for assaulting and sexually assaulting Doe. Count V of Doe's complaint refers to an order of protection against Parrillo, and one of the text message screenshot exhibits states that she obtained an injunction against him, but such an order does not appear in the record.

"adequate guidance" (see *Haslip*, 499 U.S. at 18) by giving Illinois Pattern   Jury Instructions, Civil, No. 14.01, defining " 'willful and wanton conduct,' " and No. 35.01, allowing the jury to award punitive damages for such conduct after considering three questions, including one modeled almost verbatim from the *Campbell* reprehensibility factors. See Illinois Pattern Jury Instructions, Civil, Nos. 14.01, 35.01 (approved Dec. 8, 2011). Based on the facts and circumstances of Parrillo's egregiously reprehensible conduct that directly resulted in repeated personal, physical, and emotional harm to Doe, we cannot say that $8 million in punitive damages was so unreasonable as to violate due process.

¶ 59      In closing, we address Doe's final point—the "arbitrary and capricious" nature of the appellate court's decision. The Supreme Court in *Campbell* envisioned "[e]xacting appellate review" to ensure that a punitive damage award is based upon "an application of law, rather than a decisionmaker's caprice." (Internal quotation marks omitted.) *Campbell*, 538 U.S. at 418 (citing *Cooper Industries*, 532 U.S. at 436). The concern about arbitrariness and "the imprecise manner in which punitive damages systems are administered" remains the same whether the decision is that of a jury or a reviewing court. *Id.* at 417. The appellate court's reduction came after it had commented on Parrillo's "failure to present a compelling argument for reducing the amount of punitive damages" under the state common law or the federal constitution. 2020 IL App (1st) 191286, ¶ 84. More troublingly, the court's decision to slash the $8 million in punitive damages awarded by the jury to $1 million lacked any principled basis, other than a symmetry with the compensatory damages. A reviewing court should not disturb an award of punitive damages as unconstitutionally excessive unless it determines that the award falls outside the *Gore*/*Campbell* guideposts. *Cf. Deal v. Byford*, 127 Ill. 2d 192, 204 (1989) (stating that, as a matter of common law, a reviewing court should not disturb an award of punitive damages as excessive "unless it is apparent that the award is the result of passion, partiality, or corruption"). That is the exacting appellate review that is required. In conclusion, we reverse the appellate court's decision to reduce the jury's award of punitive damages and reinstate the full award.

2. Parrillo's Cross-Appeal

¶ 61       Parrillo raises multiple challenges to the appellate court's decision. We will address them in order.

¶ 62       First, Parrillo argues that Judge Varga was biased. Parrillo contends that some of Judge Varga's comments in the posttrial motion hearing, cataloged into the categories of "Hostility" and "Personal offense to charges of error," displayed "improper mind sets" that "unquestionably prejudiced the defendant against a fair consideration of the issues." Essentially, Parrillo maintains that those comments offer context by which this court can determine "the merit and fairness of the trial court's positions." Though Parrillo insists that Judge Varga's "findings/rulings should be disregarded," he fails to identify which ones.

¶ 63       We agree with the appellate court that Judge Varga's comments display frustration and not " 'such a high degree of favoritism or antagonism as to make fair judgment impossible.' " *Eychaner v. Gross*, 202 Ill. 2d 228, 281 (2002) (quoting *Liteky v. United States*, 510 U.S. 540, 555 (1994)). Further, we agree with the appellate court that, because the comments highlighted by Parrillo occurred after trial, they had no bearing on any of Judge Varga's rulings before or during trial. 2020 IL App (1st) 191286, ¶ 37 (citing *Calabrese v. Benitez*, 2015 IL App (3d) 130827, ¶ 26). Those are the rulings that resulted in the trial court's judgment on the jury's verdict, but we lack a transcript from which to read them, much less reverse them.

¶ 64       Second, Parrillo argues that the trial court abused its discretion in refusing to hear his emergency motion for a 30- to 60-day continuance or, alternatively, refusing to grant him additional time to obtain a ruling on that motion from another judge. In support, Parrillo recounts at length the events of January 14 and 15, 2019. Parrillo relies upon *Ullmen v. Department of Registration & Education*, 67 Ill. App. 3d 519, 522 (1978), which held that an attorney's family member's illness is a valid reason for a continuance.

¶ 65       The decision to grant or deny a motion for a continuance lies within the discretion of the trial court, and a reviewing court will not interfere with that decision absent a clear abuse of discretion. *People v. Walker*, 232 Ill. 2d 113, 125 (2009); accord *K&K Iron Works, Inc. v. Marc Realty, LLC*, 2014 IL App (1st)

133688, ¶ 22. "Whether there has been an abuse of discretion necessarily depends upon the facts and circumstances in each case ***." *Walker*, 232 Ill. 2d at 125. Here, the trial court did not deny such a motion; the court informed Muth that it could not entertain such a motion by local rule and provided her two opportunities to present the motion to the presiding judge. In the hearing on Parrillo's posttrial motion, Muth conceded that Judge Varga agreed to pause jury selection on January 15, 2019, so she could present the motion to the presiding judge. Judge Varga stated, "I did not close the door on her. I gave her another day. I gave her an opportunity to go to the proper courtroom." According to Judge Varga, Muth "blew off the Court" and missed that opportunity. We cannot say that the trial court abused its discretion in declining to offer her a third opportunity.

¶ 66    Third, Parrillo argues that the trial court failed to protect his rights and the integrity of the judicial process. That argument is prefatory to the remainder of the issues because it addresses the biggest hurdle to our review—namely, the lack of a trial transcript. Parrillo asserts,

"once the trial court decided to proceed to trial without the defendant or defendant's attorney being present, [the court] should have at a minimum required the proceedings be transcribed and recorded by a court reporter so the defendant would have a record of the evidence and exhibits admitted and the arguments of plaintiff [*sic*] counsel."

¶ 67    That argument is specious. In civil litigation, a party who might seek appellate review should preserve a complete record because, absent such a record, we must presume that the trial court's judgment was correct. *Corral v. Mervis Industries, Inc.*, 217 Ill. 2d 144, 157 (2005). Parrillo asks us to take judicial notice of the fact that many judges hearing civil cases in Cook County circuit court "require parties to provide court reporters when the trial court deems a report of proceedings necessary or appropriate." We decline to do so, having no means of determining the individual practices of various unnamed circuit court judges or weighing the merits of those practices. If Parrillo wanted a trial transcript for later use, he should

have ensured that a court reporter was inside the courtroom on January 15, 2019, when Doe testified, even while his attorneys were outside.[5]

¶ 68    Fourth, Parrillo argues that he and his attorneys, Muth and Holstein, did not abandon the trial. He disputes Doe's assertion before the trial court that his two attorneys made a deliberate decision not to defend him and points to Muth's "efforts," which belie "any notion" that she and Holstein abandoned him. Again, we agree with the appellate court that Parrillo's attorneys made a conscious choice not to participate in the trial. Instead, Muth opted to search for another judge who would hear and then grant an emergency motion for a lengthy continuance. When that failed, she drafted a motion for a mistrial, rather than cross-examine Doe. The trial court's characterization of that approach seems fair.

¶ 69    Fifth, Parrillo argues that his "arguments presented in this case were not waived" and that the trial court's decision to proceed to trial without them constituted "plain error." Parrillo insists that he "waived nothing" and was the victim of "a palpable injustice." That argument is not well supported and is too general to warrant much analysis. As the appellate court stated, a civil jury trial may proceed without the defense, if adequate notice has been given. 2020 IL App (1st) 191286, ¶ 47 (citing *In re Marriage of Garde*, 118 Ill. App. 3d 303, 307 (1983)); see *In re Marriage of Harnack*, 2014 IL App (1st) 121424, ¶ 47 (stating "[i]t would not be reasonable to vacate the judgment *** where any alleged errors *** are solely due to [the respondent's] failure to participate in the *** proceedings").

¶ 70    Sixth, Parrillo argues that both the jury instruction conference and the jury instructions were "improper." According to Parrillo, Judge Varga refused to allow Muth and Holstein to participate in the jury instruction conference, violating the "purpose and objective" of section 2-1107(c) of the Code of Civil Procedure. See 735 ILCS 5/2-1107(c) (West 2018). That statute states, "The court shall hold a conference with counsel to settle the instructions and shall inform counsel of the court's proposed action thereon prior to the arguments to the jury." *Id.*

---

[5]In his response brief, Parrillo refers to "[t]he exclusion ordered by the trial court." We scoured the record and found no such order. He also claims that his attorney, presumably Muth, "was not allowed to participate in the trial." Again, we found no such order.

¶ 71 Without a transcript, however, we cannot settle what Parrillo terms the "dispute *** as to whether Muth and Holstein requested to participate." Thus, we presume that the trial court acted in conformity with the law. See *Foutch v. O'Bryant*, 99 Ill. 2d 389, 392 (1984). Further, from what we can surmise, Judge Varga did conduct a conference, consistent with the statutory directive. In the hearing on Parrillo's posttrial motion, Muth insisted that she asked to participate in the jury instruction conference, but Judge Varga vehemently disagreed. Judge Varga later added that Muth and Holstein were present during the conference, but they never asked to participate. According to Judge Varga, Muth barged into the courtroom while he was preparing exhibits and instructions for the jury, and he asked her to sit down until he was finished; then she would be allowed to approach the bench. Doe's attorney called Muth's assertion "a lie, absolutely" and corroborated Judge Varga's version of events. Doe's attorney recalled:

> "When [Muth] came walking in, she busted in *** and [Judge Varga] asked her why she was here. She said she's here to present a motion for a mistrial.
>
> * * *
>
> You said do you mind if I finish collating the exhibits and pulling the jury instructions together that have already been *** ruled on, so you can hand them to your bailiff so your bailiff could hand them to the jury while they were deliberating."

As the appellate court correctly held, "no basis exists for finding that the trial court abused its discretion." 2020 IL App (1st) 191286, ¶ 63.

¶ 72 Parrillo also contends that the issues instruction was improper and that giving that instruction to the jury constituted reversible error. As the appellate court stated, a party waives the right to object on appeal to jury instructions by failing to object at trial and to offer a remedial instruction. *Id.* ¶ 62 (citing *Marek v. Stepkowski*, 241 Ill. App. 3d 862, 870 (1992)). Parrillo's attorneys did neither.

¶ 73 Seventh, Parrillo argues that the compensatory damages awarded by the jury were excessive. "The determination of damages is a question reserved to the trier of fact, and a reviewing court will not lightly substitute its opinion for the judgment rendered in the trial court." *Richardson v. Chapman*, 175 Ill. 2d 98, 113 (1997). A

reviewing court will do so only when the damage award falls outside the range of fair and reasonable compensation, results from passion or prejudice, or shocks the judicial conscience. *Id.* Again, there is no trial transcript in this case. We do not know the substance of Doe's testimony, so we cannot say that it inflamed the jury's passion or provoked its prejudice. Considering the allegations in Doe's complaint and amended complaint, as well as the trial exhibits showing her injuries, the compensatory damages were fair and reasonable.

¶ 74    Eighth, Parrillo argues that Doe's medical records should not have been admitted into evidence. Parrillo and his attorneys did not participate in the trial, so they did not object to the admission of that evidence. Any objection on appeal was therefore forfeited. See *Addis v. Exelon Generation Co.*, 378 Ill. App. 3d 781, 795 (2007).

¶ 75    Ninth and finally, Parrillo argues that the trial court improperly denied his motion for a mistrial. He notes that the appellate court resolved that issue by declaring that he and his attorneys voluntarily absented themselves from the trial. And he responds by resting on "all the arguments" presented in his response brief "supporting his claim that the trial court erred by conducting a trial in the absence of the defendant and his counsel." Parrillo utterly fails to demonstrate that Judge Varga's decision to deny the motion for a mistrial was an abuse of discretion. See *Bruntjen v. Bethalto Pizza, LLC*, 2014 IL App (5th) 120245, ¶ 15.

¶ 76                              CONCLUSION

¶ 77    For the reasons that we have stated, we reverse the appellate court's judgment as to punitive damages and affirm that judgment in all other respects, and we affirm the trial court's judgment.

¶ 78    Appellate court judgment affirmed in part and reversed in part.

¶ 79    Circuit court judgment affirmed.

¶ 80    CHIEF JUSTICE ANNE M. BURKE and JUSTICE NEVILLE took no part in the consideration or decision of this case.