NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2024 IL App (4th) 230585-U

NO. 4-23-0585

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
April 10, 2024
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| JANE DOE, | ) | Appeal from the |
|     Plaintiff-Appellee, | ) | Circuit Court of |
|     v. | ) | Winnebago County |
| ANDREW FRITCH, | ) | No. 21L275 |
|     Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Lisa Renae Fabiano, |
| | ) | Judge Presiding. |

JUSTICE HARRIS delivered the judgment of the court.
Justices Lannerd and Vancil concurred in the judgment.

**ORDER**

¶ 1    *Held*:  (1) The trial court did not err by granting partial summary judgment in plaintiff's favor as to liability.

(2) The trial court committed no error in awarding plaintiff economic, emotional distress, and punitive damages, nor did the court abuse its discretion in awarding plaintiff reasonable attorney fees.

¶ 2    Plaintiff, Jane Doe, brought a cause of action against defendant, Andrew Fritch, under the Civil Remedies for Nonconsensual Dissemination of Private Sexual Images Act (Civil Remedies Act) (740 ILCS 190/1 through 35 (West 2020)), alleging defendant made a digital video recording of plaintiff engaged in a sex act and then disseminated the video without plaintiff's consent. The trial court granted partial summary judgment in plaintiff's favor as to liability and, following a hearing on damages, awarded plaintiff $4300 in economic damages; $150,000 in emotional distress damages; $150,000 in punitive damages; and $12,485 for reasonable attorney

fees. Defendant appeals, challenging both the court's grant of partial summary judgment in plaintiff's favor and its awards of damages and attorney fees. We affirm.

¶ 3                                    I. BACKGROUND

¶ 4           In September 2021, plaintiff filed her complaint against defendant under the Civil Remedies Act. She alleged defendant made a digital video recording of her that showed her body and face and depicted her "engaging in oral sex" with defendant while "touching or fondling her breast for the purpose of sexual gratification or arousal." The video was made in the privacy of plaintiff's home while only she and defendant were present. Additionally, it was made at defendant's request and following his representation to plaintiff "that he would not share the digital recording with any third party."

¶ 5           Plaintiff alleged that despite asserting he would not share the video, defendant later uploaded it to the pornographic website "www.xhamster.com," where it was viewed at least 54,722 times. Alternatively, she alleged defendant "disseminated the digital recording to a third party who caused the video to be uploaded to [that website]."

¶ 6           According to the complaint, the video was first published on the xHamster website in or around March 2020 by an account with the username "Horny_andwannacum." On January 4, 2021, the video was published to the same website for a second time by an account with the username "RockfordPervert." Plaintiff alleged, on information and belief, that defendant used both usernames to upload the video. Additionally, she asserted the January 4, 2021, publication occurred after she asked defendant on January 3, 2021, to leave her alone and to stop messaging her.

¶ 7           Plaintiff further alleged that the video was published "with various titles, descriptions, or captions" that contained her personal information, including her first and last

- 2 -

names, the city and state where she lived, and the fact that she was a single mother. One caption indicated where the video was taken, stating: "Single mom of 3 sucks my c*** out in her kitchen." Plaintiff maintained she was identifiable in the video by both her physical appearance and the titles, descriptions, or captions displayed on the website in connection with the video.

¶ 8        Plaintiff alleged that she did not consent to the dissemination or publication of the video. She asserted defendant intentionally (1) published the video on the xHamster website or (2) disseminated the video to a third party, knowing she was identifiable in the video by her physical appearance and that she did not consent to its dissemination.

¶ 9        Plaintiff stated she suffered harm as a result of defendant's actions and asked for relief, including (1) economic and noneconomic damages proximately caused by defendant's actions, including emotional distress damages; (2) punitive damages; and (3) reasonable attorney fees and costs. She asserted that after she discovered that the video had been published online, she also discovered that entering her name in common Internet search engines produced results for several pornographic websites in addition to www.xhamster.com. Plaintiff set forth a list of 26 "pornographic sites" where she "discovered the digital recording, URL links to the digital recording, and/or still thumbnail images from the recording." As a result, she "hired a company, GuaranteedRemovals.com [(Guaranteed Removals)], to remove content from search engine results, including URL links that led to websites where the digital recording was viewable." Plaintiff stated she engaged Guaranteed Removals to remove at least 17 links, at a cost of $250 per link up to a maximum of $4250, plus 1.5% interest per month.

¶ 10        Plaintiff claimed she expended time and resources requesting that the video be removed from www.xhamster.com and other websites, as well as searching her name in various search engines. Although she was successful in removing the video from several websites, still

- 3 -

images or thumbnail pictures from the video remained visible online. Plaintiff maintained she lost income because she was not able to accept jobs as a "Shipt shopper" at the grocery store where defendant worked. She also suffered emotional distress, including (1) embarrassment from the video having been viewed by both strangers and people she knew; (2) the loss of, or damage to, close personal relationships as a result of the video being discovered; and (3) fear and anxiety regarding the safety of herself and her children due to her personal information being shared online with the video.

¶ 11        In February 2022, defendant filed a response to plaintiff's complaint and invoked his fifth amendment (U.S. Const., amend. V) privilege against self-incrimination to nearly all of the allegations of the complaint. The record shows he also provided similar responses during discovery to requests to admit, interrogatories, and requests to produce propounded by plaintiff.

¶ 12        In April 2022, plaintiff filed a motion for summary judgment. She argued defendant admitted or "effectively admitted" all of the allegations in her complaint where he did not deny the material allegations against him and, instead, invoked his fifth amendment privilege against self-incrimination. Plaintiff attached to her motion a copy of her complaint, defendant's response to her complaint, and defendant's discovery answers. In July 2022, defendant responded to plaintiff's motion, arguing his invocation of his fifth amendment privilege was not the equivalent of an admission to the allegations against him. He asserted plaintiff presented no affirmative evidence that would entitle her to summary judgment. In November 2022, the trial court denied plaintiff's motion but stated she was "not prevented from filing a future motion for summary judgment or other motion requesting judgment on the pleadings."

¶ 13        In December 2022, plaintiff filed a second motion for summary judgment, arguing no genuine issue of material fact existed. Plaintiff asserted that a cause of action under the Civil

Remedies Act required her to establish that (1) she was the depicted person in a private sexual image, (2) she was identifiable to a reasonable person in the image, (3) the private sexual image was intentionally disseminated without her consent, and (4) she suffered harm from the dissemination. She maintained each element of her claim was established through her own affidavit and its attached exhibits, all of which were attached to her motion. Plaintiff also argued that the trial court could draw a negative inference from defendant's invocation of his fifth amendment privilege and consider defendant's silence as additional supporting evidence of her allegations against him.

¶ 14    In her affidavit, plaintiff made averments that supported the allegations of her complaint. She stated she met defendant in the summer of 2018. They exchanged phone numbers and e-mail addresses and "corresponded numerous times via text message and email." In 2019, the two had an intimate relationship, and defendant asked "if he could record a video of [plaintiff] performing oral sex on him." Defendant made such a video in the kitchen of plaintiff's residence while only the two of them were present. Plaintiff stated she had seen the video and that it showed her body and face, along with her "touching [her] breast for the purpose of sexual gratification or arousal." Plaintiff told defendant she "did not want the video to be shared with anyone else," and defendant represented to plaintiff that "he would not share the video."

¶ 15    Plaintiff stated she and defendant stopped seeing one another after she "found a more serious boyfriend." Later, she found that the video defendant recorded had been posted "on a pornographic website called 'xHamster.com.' " She learned that the video had been posted twice to the website, once in March 2020 and a second time on January 4, 2021. The January 4 posting occurred one day after plaintiff asked defendant to stop contacting her via text messages and e-mail. Captions on the website included her personal information, such as her name, her location,

her status as a single mother, and that the video was recorded in the kitchen of her residence. Plaintiff attached screenshots she took of the video posted on the xHamster website to her affidavit.

¶ 16 After discovering that the video had been posted online, plaintiff confronted defendant via text message, and he "tacitly" admitted that he posted the video and asked plaintiff not to contact the police. Plaintiff attached her text message communications with defendant as an exhibit to her complaint. In one communication, defendant indicated he did not make the March 2020 posting, stating "That's not me!! I swear to god and anyone! That's a repost!! I deleted everything!!" After plaintiff threatened to contact the police, defendant made the following statements: (1) "It's off the internet :/ I'm gonna pay for that, for sure. It's truly gone forever. Just please don't involve the police. I will b shamed forever and prolly left and hated by many. It'll never ever come up again"; (2) "It's gone forever and no one will see or remember it :/ there's got to b some other way"; (3) "I will! And I will gladly send money every week until I die! Seriously. U can count on a weekly payment for as long as I live. Anything. Anything to not involve the police. U are due and I'll pay. Every week"; (4) "It'll be payments until I'm dead. For real"; (5) "The payments will b no more, maybe less if I lose my job and go to jail. U know that. I'll figure a number out but it'll b more consistent than if I have zero income."

¶ 17 Plaintiff further described discovering that the video had been "linked and posted" on additional websites, as well as her efforts to "remove the video online or to remove the internet search results." She also described the harm she suffered as a result of the video being posted online. To her affidavit, she attached screenshots of the other websites where the video had been posted, a copy of her contract with Guaranteed Removals, and additional e-mail and text communications she had with defendant in which he indicated he would help pay for the video being removed from the Internet.

¶ 18        In February 2023, defendant filed a response to plaintiff's second summary judgment motion, arguing genuine issues of material fact existed as to whether he disseminated the video at issue and whether plaintiff suffered harm. Relevant to this appeal, defendant argued plaintiff did not present any proof that he "uploaded" the video. He asserted that in text message communications with plaintiff, he "never admit[ted] to placing the video on the internet."

¶ 19        In March 2023, the trial court conducted a hearing on plaintiff's motion and granted partial summary judgment in her favor as to liability. In setting forth its ruling at the hearing, the court addressed the issue of dissemination, stating as follows:

> "Through the circumstantial evidence of—that [the video] was in [defendant's] possession, it ended up on the—he's the one that took it, it ended up on the internet with details *** that only he would know that it was taken in the kitchen—in her kitchen, her, her name, *** where she lived. And then also with the text messages where he does not deny that it was him, that he agrees to pay her. I think he takes— I think those text messages also add considerable weight in terms of circumstantial evidence that it was him. So I, I think that the affidavit amply supports a finding that he—that it was [defendant] who, who posted the video on, on the internet in the first instance."

Finding that plaintiff presented sufficient evidence to support the allegations in her complaint, the court stated it was unnecessary to construe defendant's assertion of his fifth amendment privilege against him.

¶ 20        In April 2023, plaintiff filed a motion for attorney fees, along with an affidavit in support of that motion. She noted that the Civil Remedies Act allowed the trial court to award a prevailing party reasonable attorney fees and costs. Pointing to the court's grant of partial summary

judgment in her favor, plaintiff asked the court to award her reasonable attorney fees of $12,485, representing 45.4 hours of billable time at a rate of $275 per hour. Plaintiff's counsel represented that he had expended a total of 96.9 hours on plaintiff's case but, "in exercising billing judgment, [he] removed 53.8 hours of time expended on clerical work, communications with [plaintiff], communications with opposing counsel, legal research, and edits to substantive writing."

¶ 21 Also in April 2023, the trial court conducted a hearing on damages. Plaintiff was the sole witness at the hearing. She testified she had two children, worked two jobs, and was also "getting ready to graduate from cosmetology school." Plaintiff stated she met defendant at the Meijer grocery store where he worked. At the time, plaintiff worked as a "Shipt shopper," delivering groceries from Meijer. The two initially developed a friendship and, later, their relationship became sexual.

¶ 22 Plaintiff recalled discovering that the video at issue had been posted online. She testified that in January 2021, someone she knew called her and told her she needed to "Google [her] name." Thereafter, plaintiff discovered the video "had been posted on xhamster.com and picked up by several other sites." When she viewed the video online, she felt "[t]errified, *** mortified, *** suicidal, *** panic, anger, [and] sadness." Posted along with the video was her full name, city, and state. The posting also identified her as a "single mom of three." (Plaintiff noted that although she only had two biological children, she had a stepson, whom she considered to be her child.) She stated that anybody who looked up her name online would also discover the video. Plaintiff felt fearful after seeing her personal information posted along with the video.

¶ 23 Ultimately, plaintiff discovered that the video had been posted twice on the xHamster website. One of the postings had approximately 55,000 views. After seeing how many times the video had been viewed, plaintiff felt suicidal. She explained that she did not "know every

person who" had seen the video or if it was "ever going to go away." Plaintiff stated that her ex-boyfriend found the video and was showing it to people she went to school with. As a result, plaintiff went to court to get a restraining order against her ex-boyfriend and spent $750 on an attorney. She stated that she heard the same person had sent the video to her father. Plaintiff noted that she had not spoken to her father since January 2021, and she believed the video was the reason why they had not spoken. She testified she saw her father in September 2022, "and he called [her] a whore and walked away." Plaintiff was also concerned that some day her children might discover the video.

¶ 24        Plaintiff maintained that she had spent hours trying to get the video removed from the Internet. She described that process as overwhelming and frustrating. Eventually, plaintiff engaged Guaranteed Removals to take "links down," which she stated was very costly. Plaintiff had an agreement with Guaranteed Removals under which she agreed to pay $250 for each link that was removed. The total cost of the contract "was around" $4200 to $4300. So far, she had paid Guaranteed Removals $575 out of her own pocket.

¶ 25        Plaintiff testified she did "searches" for her name online "probably a dozen times a day." She believed she would have to "deal with" the video having been posted online for the rest of her life and that the issue of the video being posted online could continue to "crop back up." She noted that in January 2023, approximately two years after she originally found the video online, she found two additional Internet links that had thumbnail images from the video. She asserted she had to pay to have those links removed, at a cost of $250 per link.

¶ 26        Plaintiff described feeling "hopeless" as a result of what happened. She was "fearful of people having seen" the video. She believed the video would never go away, that it would continue to be a problem for her, and that it would continue to cost her money. Plaintiff described

the dissemination of the video as "the worst heartbreak of [her] life" and "the worst thing [she had] ever been through in [her] life." She indicated that, in addition to her father, there were other family members who would not speak to her because of the video.

¶ 27 On cross-examination, plaintiff acknowledged that she agreed to the video being taken by defendant, but she asserted there had been an understanding between them "that it would never be shared with anybody." She further acknowledged that the money she had spent to address issues with the video was $750 for an attorney and $575 to the removal company. However, plaintiff testified she was contractually obligated to pay a total of $4250 to Guaranteed Removals, and she was making monthly payments that, thus far, totaled $575.

¶ 28 At the conclusion of the hearing, the trial court took the matter under advisement. In June 2023, the court issued its ruling both orally and in writing, awarding plaintiff (1) $4300 in economic damages, (2) $150,000 in emotional distress damages, (3) $150,000 in punitive damages, and (4) $12,485 in attorney fees.

¶ 29 This appeal followed.

¶ 30 II. ANALYSIS

¶ 31 A. Partial Summary Judgment

¶ 32 On appeal, defendant first argues the trial court erred by granting partial summary judgment in plaintiff's favor because there was a genuine issue of material fact as to whether he disseminated the video at issue. In particular, he asserts plaintiff presented insufficient evidence that he "uploaded the video," contending the text message communications she presented contained "no clear admission" that he was the one who "uploaded" or "posted" the video online. Defendant maintains that although he agreed to pay money to plaintiff in those communications, he did so only after plaintiff threatened him with legal action.

¶ 33 Summary judgment is appropriate "if the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." 735 ILCS 5/2-1005(c) (West 2022). "Summary judgment is a drastic means of disposing of litigation and should be allowed only when the right of the moving party is clear and free from doubt." *Beaman v. Freesmeyer*, 2021 IL 125617, ¶ 72, 183 N.E.3d 767. "Where a reasonable person could draw divergent inferences from the undisputed material facts or where there is a dispute as to a material fact, summary judgment should be denied and the issue decided by the trier of fact." *Id.*

¶ 34 "Where a plaintiff has moved for summary judgment, the materials relied upon must establish the validity of the plaintiff's factual position on all the contested elements of the cause of action." (Emphasis omitted.) *Triple R Development, LLC v. Golfview Apartments I, L.P.*, 2012 IL App (4th) 100956, ¶ 7, 965 N.E.2d 452. Further, "[a] party opposing a motion for summary judgment cannot rest on its pleadings if the other side has supplied uncontradicted facts that would warrant judgment in its favor [citation], and unsupported conclusions, opinions, or speculation are insufficient to raise a genuine issue of material fact [citation]." *Valfer v. Evanston Northwestern Healthcare*, 2016 IL 119220, ¶ 20, 52 N.E.3d 319.

¶ 35 Further, when considering whether a summary judgment motion should be granted, a court "must construe the pleadings, depositions, admissions, and affidavits strictly against the movant and liberally in favor of the nonmoving party." *Beaman*, 2021 IL 125617, ¶ 72. The trial court's ruling on a motion for summary judgment is subject to *de novo* review. *Id.*

¶ 36 Under the Civil Remedies Act, a person depicted in a sexual image may bring a cause of action against someone who intentionally disseminated the image without the depicted person's consent. 740 ILCS 190/10 (West 2020). Specifically, section 10(a) of the Civil Remedies

Act states as follows:

> "[I]f a depicted individual is identifiable to a reasonable person and suffers harm from the intentional dissemination *** by a person over the age of 18 of a private *** sexual image without the depicted individual's consent, the depicted individual has a cause of action against the person if the person knew or recklessly disregarded the possibility that:
>
>> (1) the depicted individual did not consent to the dissemination;
>>
>> (2) the image was a private *** sexual image; and
>>
>> (3) the depicted individual was identifiable." *Id.* § 10(a).

" 'Dissemination' or 'disseminate' means publication or distribution to another person with intent to disclose." *Id.* § 5(4).

¶ 37    Here, we agree with the trial court that there was no issue of material fact that defendant was the person who disseminated the video. In her complaint, plaintiff alleged that defendant uploaded the video to the pornographic xHamster website or, alternatively, that he disseminated the digital recording to some third party who caused it to be uploaded. To support her claim, plaintiff presented her own affidavit and supporting documentation, including text message exchanges between the parties and screenshots from where the video was posted online.

¶ 38    Plaintiff's evidence showed that defendant made and possessed the sexually explicit video at issue. The video was recorded by defendant in plaintiff's kitchen while only those two individuals were present. Later, plaintiff discovered that the video defendant possessed had been posted to a pornographic website with her identifying personal information, including her first and last name, the city and state where she lived, and the fact that she was a single mother. A caption on the video accurately described where it was recorded—plaintiff's kitchen. When

plaintiff confronted defendant about the video, he made statements that indicated he was the party responsible for posting the video online. Specifically, defendant offered to pay plaintiff money in connection with having the video removed from the Internet. He also asked plaintiff not to contact the police, stating that he would go to jail and suggesting that he would be "shamed" and "hated."

¶ 39    We find plaintiff's evidence was sufficient to establish that defendant disseminated the video, a necessary element of her claim for relief under the Civil Remedies Act. In responding to plaintiff's summary judgment motion, defendant did not dispute any of the facts set forth by plaintiff, nor did he present any contradictory evidence.

¶ 40    Moreover, although not relied upon by the trial court, we find summary judgment in plaintiff's favor is further supported by the adverse inference that may be drawn against defendant based upon his assertion of his fifth amendment privilege against self-incrimination. The adverse inference from invoking the fifth amendment privilege may be relied upon in a civil proceeding at the summary judgment stage when "additional evidentiary support for the motion for summary judgment is also presented." *People v. $174,980 U.S. Currency*, 2013 IL App (1st) 122480, ¶ 35, 996 N.E.2d 1102; see *Independent Trust Corp. v. Hurwick*, 351 Ill. App. 3d 941, 954, 814 N.E.2d 895, 906 (2004) (stating a court may draw a negative inference for the assertion of the privilege against self-incrimination and "grant summary judgment if there was evidentiary support of the motion as well"). In this instance, the evidence presented by plaintiff and the adverse inference that may be drawn by defendant's assertion of his fifth amendment privilege support both the court's (1) finding that there was no genuine issue of material fact regarding the identity of the person who disseminated the video and (2) grant of partial summary judgment in plaintiff's favor.

¶ 41    B. Economic and Emotional Distress Damages

¶ 42        On appeal, defendant next argues that the trial court's awards of $4300 in economic damages and $150,000 in emotional distress damages were against the manifest weight of the evidence. He contends plaintiff's testimony and evidence established that her actual damages related to the dissemination of the video totaled, at most, $1325, representing the $575 she paid to Guaranteed Removals and the $750 she paid to an attorney. Further, defendant suggests that plaintiff's testimony alone was insufficient to support the court's award of damages for emotional distress.

¶ 43        Under the Civil Remedies Act, a plaintiff may recover "the greater of" either (1) "economic and noneconomic damages proximately caused by the defendant's dissemination ***, including damages for emotional distress" or (2) statutory damages up to $10,000. 740 ILCS 190/25(a)(1) (West 2020). The trial court's award of damages is reviewed under the manifest weight standard. *Young v. Wilkinson*, 2022 IL App (4th) 220302, ¶ 84, 213 N.E.3d 486. Further, a court's decision is against the manifest weight of the evidence "only if the opposite result is clearly evident." (Internal quotation marks omitted.) *Id.*

¶ 44        Here, plaintiff testified that in addressing issues related to the dissemination of the video, she spent $750 for an attorney to obtain a restraining order against a third party who was sharing the video and $575 to Guaranteed Removals for the removal of Internet "links" associated with the video. Plaintiff asserted she entered into an agreement with Guaranteed Removals, which obligated her to pay the company a total of $4250, representing a rate of $250 per link removed. Plaintiff maintained she was making monthly payments toward what she owed and had paid a total of $575 as of the date of the hearing. A copy of the agreement, dated March 6, 2021, was presented in connection with plaintiff's motion for summary judgment. Additionally, a transcript of the hearing on damages indicates a copy of the agreement was also admitted into evidence at

defendant's request. The record shows the agreement contained a list of 17 links identified for removal, at a cost of $250 per link, and it stated plaintiff agreed to pay Guaranteed Removals "by credit card in 10 monthly installments of up to $425.00 USD each." Finally, plaintiff's testimony at the hearing also showed that as recently as January 2023, she found two additional Internet links associated with the video that she reportedly paid $500 to remove.

¶ 45    We find the above evidence was sufficient to support the trial court's economic damages award of $4300. Accordingly, the court's award was not against the manifest weight of the evidence.

¶ 46    We similarly find the trial court's award of $150,000 in emotional distress damages was sufficiently supported by the record. Plaintiff testified regarding her discovery of the sexually explicit video on pornographic websites along with her personal identifying information. She described how she felt after seeing the video—terrified, mortified, suicidal, panicked, angry, and sad—and the effect its dissemination had on her life. Plaintiff indicated her personal relationships had been affected. She described feeling hopeless as a result of what happened and stated that she was fearful regarding who had seen the video and who might see it in the future. She did not believe the video would ever go away and described the dissemination of the video as "the worst heartbreak of [her] life" and "the worst thing [she had] ever been through in [her] life."

¶ 47    As noted, on appeal, defendant suggests evidence of emotional damages was insufficient because the only evidence plaintiff presented as to such damages was her own testimony. He notes plaintiff "provided no witness testimony, no proof of medical treatment or counseling[,] and no proof of how the video being posted ha[d] affected her life." Defendant also complains that "much of [plaintiff's] own testimony was objected to inadmissible hearsay and lacked foundation."

¶ 48　　　　　First, as argued by plaintiff, emotional distress damages may be established through a plaintiff's own testimony, and expert testimony is not required. *Thornton v. Garcini*, 237 Ill. 2d 100, 108-09, 928 N.E.2d 804, 809-10 (2010). In this instance, plaintiff's testimony indicated she was significantly affected by having a sexually explicit video of her posted online, where it could be viewed countless times and was subject to further dissemination. In setting forth its oral ruling, the trial court stated it found plaintiff's testimony regarding the impact that the dissemination of the video had upon her was "very credible," and that she would forever be "saddled with" what had occurred. We find no error in the court's determinations.

¶ 49　　　　　Second, defendant has forfeited any challenge to plaintiff's testimony on the grounds that it contained inadmissible hearsay or lacked foundation. Although defendant raised objections to certain portions of plaintiff's testimony below, the trial court overruled his objections. On appeal, he raises no proper challenge to the court's evidentiary rulings. See Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020) (stating points not argued in an appellant's brief "are forfeited and shall not be raised in the reply brief, in oral argument, or on petition for rehearing").

¶ 50　　　　　Under the circumstances presented, we find both the trial court's award of $4300 in economic damages and its award of $150,000 in emotional distress damages were sufficiently supported by the record. Neither damage award was against the manifest weight of the evidence.

¶ 51　　　　　　　　　　　　C. Punitive Damages

¶ 52　　　　　On appeal, defendant further challenges the trial court's award of $150,000 in punitive damages. He contends the court abused its discretion by awarding such damages because "[t]here was not a sufficient showing of maliciousness to warrant an award of punitive damages." Alternatively, defendant argues the amount awarded was excessive and violated his due process rights.

¶ 53　　　　　In this instance, the Civil Remedies Act specifically allows a plaintiff to recover punitive damages. 740 ILCS 190/25(a)(3) (West 2020). "In general, punitive damages are meant to punish the wrongdoer and to deter that party, and others, from committing similar acts in the future." *McQueen v. Green*, 2022 IL 126666, ¶ 58, 202 N.E.3d 268. Such damages may be awarded in circumstances where the defendant's conduct demonstrates "a high degree of moral culpability, that is, when the tort is committed with fraud, actual malice, deliberate violence or oppression, or when the defendant acts willfully, or with such gross negligence as to indicate a wanton disregard of the rights of others." (Internal quotation marks omitted.) *Slovinski v. Elliot*, 237 Ill. 2d 51, 58, 927 N.E.2d 1221, 1225 (2010). "[A] trial court's decision to award punitive damages will not be reversed absent an abuse of discretion." *In re Estate of Savage*, 259 Ill. App. 3d 328, 332, 631 N.E.2d 797, 800 (1994).

¶ 54　　　　　As noted, defendant initially argues there was an insufficient showing that punitive damages were warranted in the present case. We disagree. Not only does the Civil Remedies Act explicitly authorize such an award in cases like the one at bar, but the facts presented showed defendant acted willfully and with wanton disregard for plaintiff. Evidence showed that although plaintiff consented to defendant recording a video of their sexual encounter, she informed him she did not consent to the video being shared with any third party. Despite plaintiff's lack of consent, defendant posted the video online to a pornographic website. In setting forth its ruling, the trial court found defendant's conduct was particularly egregious because he posted plaintiff's personal and identifying information along with the video. Referencing evidence that showed one online posting was made a day after plaintiff asked defendant to stop messaging her, the court also found defendant acted in retaliation, with the intention to humiliate plaintiff. The court's findings are supported by the record, and it did not abuse its discretion in finding a punitive damages award

was warranted in this case.

¶ 55　　　　Regarding defendant's claim that the trial court's punitive damage award was excessive, we note there are two distinct standards for evaluating such a claim: (1) the Illinois common law standard or (2) the federal due process standard. *Doe v. Parrillo*, 2021 IL 126577, ¶ 38, 185 N.E.3d 1248; see *Blount v. Stroud*, 395 Ill. App. 3d 8, 22, 915 N.E.2d 925, 939 (2009). Under common law, the trier of fact must "decide based on the evidence presented whether the defendant's conduct was sufficiently willful or wanton to warrant the imposition of punitive damages." *Blount*, 395 Ill. App. 3d at 22. In reviewing a punitive damages award, "relevant circumstances to consider include, but are not limited to, the nature and enormity of the wrong, the financial status of the defendant, and the potential liability of the defendant." *Id.* (citing *Deal v. Byford*, 127 Ill. 2d 192, 204, 537 N.E.2d 267, 272 (1989)). "A judge or jury's assessment of punitive damages will not be reversed unless the manifest weight of the evidence shows that the assessment was so excessive as to demonstrate passion, partiality, or corruption on the part of the decision-maker." *Franz v. Calaco Development Corp.*, 352 Ill. App. 3d 1129, 1145, 818 N.E.2d 357, 373 (2004).

¶ 56　　　　Here, the trial court's punitive damage award was not against the manifest weight of the evidence. As noted above, the evidence demonstrated defendant's conduct was willful and wanton. Defendant posted a sexually explicit video of plaintiff online to a pornographic website without her consent. Along with the posting, he included her personal identifying information, ensuring that the video would be linked to plaintiff through online searches. Evidence indicated the video was viewed thousands of times, not only by strangers but also by people known to plaintiff. After the initial postings, plaintiff discovered additional links to other websites of either the video itself or still images from the video. Plaintiff's testimony demonstrated that she was

significantly harmed by defendant's dissemination of the video. Again, defendant complains that evidence at the damages hearing consisted solely of plaintiff's testimony, which he characterizes as being "reliant on hearsay" and insufficient to support the harm she allegedly suffered. For the reasons already expressed, defendant's claims lack merit.

¶ 57    Defendant also contends that the trial court's punitive damages award lacked a sufficient basis because no evidence was presented as to his finances. Ultimately, the record reflects neither party presented evidence of defendant's financial circumstances, a fact noted by the court when setting forth its ruling. However, the lack of such evidence does not preclude punitive damages from being awarded. See *Deal*, 127 Ill. 2d at 204-05 ("Evidence regarding the financial status of a defendant is simply one relevant consideration to be weighed by the judge or jury in determining an appropriate award of punitive damages" and the absence of such evidence does not require that an award be set aside.); *Stump v. Swanson Development Co., LLC*, 2014 IL App (3d) 110784, ¶ 65, 5 N.E.3d 279 (stating a punitive damages award would "not be overturned just because the defendant did not present evidence of financial worth at trial" (Internal quotation marks omitted.)); *Wilson v. Colston*, 120 Ill. App. 3d 150, 153, 457 N.E.2d 1042, 1044 (1983) ("[A] plaintiff need not introduce evidence of a defendant's financial worth to obtain an award of punitive damages.").

¶ 58    Here, the record fails to reflect that the trial court's punitive damages award was the result of passion, partiality, or corruption. Under the circumstances presented, defendant has failed to demonstrate that the award was against the manifest weight of the evidence.

¶ 59    As noted, defendant also challenges the constitutionality of the trial court's punitive damages award. A punitive damages award may be unconstitutional, in violation of the due process clause of the fourteenth amendment (U.S. Const., amend. XIV), if it is "grossly excessive."

*Parrillo*, 2021 IL 126577, ¶ 43 (citing *BMW of North America, Inc. v. Gore*, 517 U.S. 559, 562 (1996)). Relevant " 'guideposts' " for such an inquiry include: "(1) 'the degree of reprehensibility' of the defendant's conduct, (2) 'the disparity between the harm or potential harm' suffered by the plaintiff and the amount of punitive damages, and (3) 'the differences between this remedy [of punitive damages] and the civil penalties authorized or imposed in comparable cases.' " *Id.* (quoting *Gore*, 517 U.S. at 574-75).

¶ 60 According to the United States Supreme Court, "the first guidepost, reprehensibility, [is] the most important because it relate[s] to the enormity of the defendant's offense." (Internal quotation marks omitted.) *Id.* ¶ 44 (quoting *Gore*, 517 U.S. at 575). When determining the reprehensibility of a defendant's conduct, courts should consider whether:

> "the harm caused was physical as opposed to economic; the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; and the harm was the result of intentional malice, trickery, or deceit, or mere accident." *State Farm Mutual Automobile Insurance Co. v. Campbell*, 538 U.S. 408, 419 (2003).

¶ 61 The second guidepost involves "a comparison between compensatory and punitive damages." *Parrillo*, 2021 IL 126577, ¶ 44 (quoting *Gore*, 517 U.S. at 581). Although the United States Supreme Court has declined "to impose a bright-line ratio which a punitive damages award cannot exceed," it has noted "that, in practice, few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process." *Campbell*, 538 U.S. at 425. Ultimately, "[s]ingle-digit multipliers are more likely to comport with due process, while still achieving the State's goals of deterrence and retribution, than awards with

ratios in [the] range of 500 to 1." *Id.* In *Parrillo*, our supreme court found a ratio of 8 to 1 was appropriate, noting it was a "single-digit multiplier" and that the defendant's conduct, which involved violence and sexual assault, was particularly reprehensible. *Parrillo*, 2021 IL 126577, ¶ 55.

¶ 62    Finally, "the third guidepost, comparable misconduct, encompasse[s] both civil and criminal penalties sanctioned by the legislature." *Id.* ¶ 44 (citing *Gore*, 517 U.S. at 583). While "[p]unitive damages are not a substitute for the criminal process, and the remote possibility of a criminal sanction does not automatically sustain a punitive damages award," the fact that a criminal penalty exists "does have bearing on the seriousness with which a State views the wrongful action." *Campbell*, 538 U.S. at 428.

¶ 63    Ultimately, whether a punitive damage award was unconstitutionally excessive is subject to *de novo* review. *International Union of Operating Engineers, Local 150 v. Lowe Excavating Co.*, 225 Ill. 2d 456, 469, 870 N.E.2d 303, 313 (2006).

¶ 64    On appeal, defendant acknowledges that his conduct may be deemed reprehensible. However, he contends the remaining two "guideposts" weigh in favor of striking the trial court's award. He argues evidence showed that plaintiff's damages totaled only $1325, which he maintained was "grossly disproportionate" to the $150,000 punitive damages award. Further, defendant points out that under the Civil Remedies Act, he was subject to a statutory fine of no more than $10,000, and that "a person convicted of the relevant criminal statute is subject to a Class 4 felony which is punishable by [a one to three] year prison sentence] and up to a $25,000 fine." See 720 ILCS 5/11-23.5(f) (West 2020) (identifying the nonconsensual dissemination of private sexual images as a Class 4 felony).

¶ 65    First, for the reasons expressed above, the trial court committed no error in finding

plaintiff suffered economic and emotional distress damages well in excess of the $1325 claimed by defendant. The court awarded economic damages of $4300 and emotional distress damages totaling $150,000. As noted by the court there was a "1 to 1 ratio" between the amount of emotional distress damages it awarded and its award of punitive damages. Such figures are not "grossly disproportionate."

¶ 66    Second, the Civil Remedies Act clearly does not limit a plaintiff's recovery to $10,000. Rather, as set forth above, it states a plaintiff may recover "the greater of" either (1) "economic and noneconomic damages ***, including damages for emotional distress" or (2) statutory damages up to $10,000. 740 ILCS 190/25(a)(1) (West 2020). Further, that criminal penalties exist based upon the nonconsensual dissemination of a private sexual images reflects the seriousness with which this State views defendant's conduct. Under the circumstances, we do not find the trial court's punitive damages award was grossly excessive.

¶ 67                                    D. Attorney Fees

¶ 68    Finally, on appeal, defendant argues the trial court abused its discretion in awarding plaintiff $12,485 in attorney fees. Initially, he contends the court's award was unwarranted because the underlying matter was resolved through partial summary judgment and by a hearing on damages that had one witness and lasted approximately two hours. Alternatively, he contends the amount of fees awarded by the court was excessive. In particular, he points out that plaintiff's counsel billed 13.8 hours for discovery, "which amounted to [$3795] in fees taking into account Plaintiff's stated hourly rate of $275." Defendant contends, however, that discovery in the case "was not complicated and is not reasonably attributable to that [claimed] amount of fees."

¶ 69    "Illinois follows the 'American rule,' which prohibits prevailing parties from recovering their attorney fees from the losing party, absent express statutory or contractual

provisions." *Sandholm v. Kuecker*, 2012 IL 111443, ¶ 64, 962 N.E.2d 418. In this instance, the Civil Remedies Act contains a fee-shifting provision, providing that a prevailing plaintiff may recover "reasonable attorney's fees and costs." 740 ILCS 190/25(b)(1) (West 2020). "A trial court has broad discretion in awarding attorney fees, and its discretion will not be reversed on appeal absent an abuse of discretion." *Grauer v. Clare Oaks*, 2019 IL App (1st) 180835, ¶ 132, 136 N.E.3d 123.

¶ 70        Here, the trial court had discretion to award plaintiff, as the prevailing party, reasonable attorney fees. Although defendant challenges the amount plaintiff's counsel billed for discovery, which he maintains was uncomplicated, the record supports plaintiff's contention on appeal that the amount billed was reasonable. In particular, plaintiff notes she issued interrogatories, requests to produce, and requests to admit to defendant, and that she twice supplemented her own responses to defendant's discovery requests. Plaintiff further points out that due to the nature of the underlying proceeding, her counsel had to draft and seek a protective order to ensure that materials produced in discovery were not further disseminated. Additionally, the record reflects a discovery dispute over defendant's attempt to obtain plaintiff's mental health records. In response to defendant's motion to compel, plaintiff filed a motion to strike, and the matter was later resolved in plaintiff's favor following a July 2022 hearing. Under these circumstances, the record fails to reflect the court abused its discretion.

¶ 71                                III. CONCLUSION

¶ 72        For the reasons stated, we affirm the trial court's judgment.

¶ 73        Affirmed.